**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:13cr25**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM AND** |
| **2) CRISTIAN NEVAREZ BELTRAN** | ) | **RECOMMENDATION** |
| **3) JORGE ALBERTO BERNAL,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Defendant Beltran's Motion to Suppress (#27) and the Motion to Adopt Motion (#45) made by Defendant Bernal. The undersigned conducted a hearing on January 22, 2014, and heard evidence from the Government and arguments from counsel. Having carefully considered the evidence, briefs, and arguments of counsel, the Court enters the following findings, conclusions, and recommendation.

## FINDINGS AND CONCLUSIONS

### I. Procedural Background

The grand jury issued a Bill of Indictment (#1) on April 2, 2013, charging Defendants Beltran, Bernal and co-defendant Juan Francisco Alfaro with various criminal offenses. In count one, all three Defendants are charged with conspiring

1

to possess with intent to distribute at least 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 846. In count two, Mr. Beltran is charged with possessing a firearm in or affecting commerce while he was an alien illegally and unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5)(A) and 924. In count three, Mr. Bernal is charged with possessing a firearm in or affecting commerce while he was an alien illegally and unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5)(A) and 924.

Defendant Beltran filed a Motion to Suppress (#27) on May 29, 2013. On June 25, 2013, the Government filed a response to the motion (#32). On August 23, 2013, Defendant Bernal filed a motion to adopt Defendant Beltran's motion (#45) to which the Government filed a response (#46) stating that the Government did not object to the motion. Accordingly, the undersigned allowed Beltran's motion by Order (#47) on September 25, 2013.

By Order (#59) filed on November 6, 2013, the undersigned ordered that recordings made of telephone conversations and an oral conversation that Mr. Alfaro had with a confidential informant be translated from Spanish into English and that a written transcript of such recordings in both languages be prepared.

Defendants Beltran and Bernal consented to have the motions to suppress heard jointly. (T. p. 2.) The undersigned provided counsel for both Mr. Beltran

and Mr. Bernal a period of one week after the hearing to submit supplemental briefs, but such briefs were not filed.

## II. Factual Background

### A. Detective Emanuel Zaragoza

At the hearing, the Government called Detective Emanuel Zaragoza as a witness. Detective Zaragoza has been employed as a law enforcement officer with the Henderson County, North Carolina Sheriff's Office for twelve years and has been a detective with the Narcotics Unit for four and one-half years. (T. p. 4.) He is also a Task Force Officer with the Homeland Security Investigation Task Force. (T. p. 5.) On December 19, 2012, Detective Zaragoza was working with a confidential informant for the purposes of investigating narcotics trafficking. (T. pp. 7-8.) The informant owned a garage located on a public road known as "Tracy Grove Extension" in Hendersonville, North Carolina. (T. p. 7.) The informant told Detective Zaragoza that Juan Alfaro had offered to sell ounce quantities of methamphetamine to the confidential informant. (T. pp. 8, 64.) The informant took Detective Zaragoza to the residence of Mr. Alfaro, which was located off of Jackson Loop Road in Flat Rock, North Carolina. (T. pp. 8-9.)

On January 22, 2013, Detective Zaragoza had the confidential informant place a recorded telephone call to Mr. Alfaro in an attempt to purchase

methamphetamine from Mr. Alfaro. (T. p. 9.) The conversation was conducted in Spanish, which was understood by Detective Zaragoza who has spoken Spanish all of his life. (T. p. 10.) Detective Zaragoza not only recorded the telephone call, but was also able to listen to the conversation as it occurred live. (T. pp. 10, 36-38.) During the conversation, Mr. Alfaro stated he wanted to meet with the confidential informant in person at the confidential informant's place of business for the purpose of discussing the price of the methamphetamine. (T. pp. 12-13.) A meeting was scheduled between the confidential informant and Mr. Alfaro for the next morning. (T. pp. 12-13.)

On January 23, 2013, Detective Zaragoza and DEA Task Force Officer Aaron Lisenbee met with the confidential informant for the purpose of having the informant place another recorded telephone call to Mr. Alfaro. (T. p. 13.) In the telephone call, Mr. Alfaro again agreed to meet the confidential informant. Detective Zaragoza and Task Force Officer Lisenbee then installed upon the body of the informant a device that records oral conversations and also transmits them so they can be heard by others in real time. (T. p. 14.) After installing the device on the confidential informant, Detective Zaragoza, Task Force Officer Lisenbee and thirteen other officers took up surveillance positions in order to hear the conversations between Mr. Alfaro and the confidential informant, and so they

could monitor the proposed drug transaction.  (T. pp. 14, 42.)

Mr. Alfaro arrived at the confidential informant's place of business in a green Ford truck that was registered to Mr. Alfaro.  (T. p. 15.)  Mr. Alfaro and the informant discussed the price of the methamphetamine, which Mr. Alfaro said would cost $1,200 per ounce.  (T. p. 16.)  The confidential informant asked Mr. Alfaro if there could be a better price, and Mr. Alfaro stated he would have to call his source of supply. (T. pp. 16, 51.)  Mr. Alfaro then stepped outside to place the call.  (T. p. 16.)  From his position, Detective Zaragoza saw Mr. Alfaro use his cell phone to make the call.  (T. p. 16.)

After a few minutes, Mr. Alfaro went back inside the garage and told the confidential informant the price was firm at $1,200 per ounce. (T. p. 16.) The informant then ordered four ounces of methamphetamine from Mr. Alfaro.  (T. p. 16.)  At that point, Mr. Alfaro told the confidential informant that Mr. Alfaro had to go home and pick up his work truck, but that he would be back to deliver the four ounces of methamphetamine to the confidential informant.   (T. p. 16.) Detective Zaragoza, Task Force Officer Lisenbee, and a number of other officers then followed Mr. Alfaro to his residence and observed him go inside his house before getting into a white Ford F250 truck which had a flat bed and work tools located upon it.  (T. pp. 17, 44-49.) The officers then followed Mr. Alfaro, who

was operating the white Ford truck, to a Waffle House restaurant located on Sugar Loaf Road in Hendersonville, North Carolina. (T. p. 17.)

At the Waffle House, Mr. Alfaro went inside and ate with Defendants Beltran and Bernal. (T. p. 18.) After eating, Mr. Alfaro, Mr. Beltran, and Mr. Bernal exited the restaurant. (T. p. 19.) Mr. Alfaro entered his white Ford truck, and Mr. Beltran and Bernal entered a black Chevrolet pickup truck. (T. p. 19.) The two vehicles traveled in tandem a distance of two to three miles to the Henderson Crossing Shopping Center, which is approximately 100 yards from the confidential informant's garage. (T. pp. 19, 20-22.) At the shopping center, both the white Ford truck and the black Chevrolet pickup truck parked. (T. p. 19.) Both Mr. Bernal and Mr. Beltran exited the black Chevrolet pickup truck and got into the white Ford truck that Mr. Alfaro was operating. (T. p. 19.) Detective Zaragoza saw Mr. Beltran carrying an orange lunch box from the black Chevrolet truck, which Mr. Beltran placed in the white Ford truck. (T. p. 19.) In the opinion of Detective Zaragoza, four ounces of methamphetamine could fit into the lunch box. (T. p. 20.) Mr. Alfaro then operated the white Ford truck across Dana Road and through the parking lot of a Shell gas station onto Tracy Grove Extension, traveling in the direction of the confidential informant's garage. (T. p. 20.) At that time, Task Force Officer Lisenbee directed Officer David McMurray, who was an

interdiction officer, to conduct a vehicle stop of the white Ford work truck. Officer McMurray did so at a point when the white Ford work truck was approximately forty yards from the confidential informant's garage. (T. pp. 20, 56.)

After the white Ford truck was stopped by Officer McMurray, a search was conducted and four ounces of methamphetamine was found in the orange lunch box. (T. p. 23.) Detective Zaragoza testified that he and Task Force Officer Lisenbee had reasonable suspicion to direct the stop the white Ford work truck based upon what had been heard from the telephone calls between the confidential informant and Mr. Alfaro, what had heard in the meeting between the confidential informant and Mr. Alfaro, and what had been seen in the travels of Mr. Alfaro to his home and travel back to the confidential informant's garage, all of which confirmed what Mr. Alfaro had stated about the delivery of the methamphetamine. (T. pp. 32-33, 50-52, 87.)

The Government introduced without objection the following exhibits:

Exhibit (1) - which is a CD containing recordings of telephone calls between the confidential informant and Mr. Alfaro;

Exhibit (2) - which is a CD containing recordings from the "Kel" which was the recording and transmitting device the confidential informant was wearing;

Exhibit (1A) - which is a transcript both in Spanish and in English of telephone calls between the confidential informant and Mr. Alfaro on January 22, 2013 at 6:30 p.m.;

Exhibit (1B) - which is a transcript both in Spanish and in English of a telephone conversation from Mr. Alfaro to the confidential informant of January 22, 2013; (T. p. 38.)

Exhibit (1C) – which is a transcript both in Spanish and English of a telephone call from the confidential informant to Mr. Alfaro of January 22, 2013 at 6:45 p.m.;

Exhibit (1D) – which is a transcript both in Spanish and English of a telephone call from the confidential informant to Mr. Alfaro of January 23, 2013 at 7:51 a.m.;

Exhibit (2A) – which is a transcript in both Spanish and English of the "Kel" recording of January 23, 2013;

Exhibit (3) – a Google map of 100 Sugarland Road, Hendersonville, North Carolina;

Exhibit (4) – an aerial photograph of 100 Sugarland Road, Hendersonville, North Carolina;

Exhibit (5) – a Google map of Hendersonville Crossing in Hendersonville,

North Carolina;

Exhibit (6) – an aerial photograph of Hendersonville Crossing Plaza and Tracy Grove Road;

Exhibit (7) – a Google map of 100 Sugar Loaf Road, Hendersonville, North Carolina;

(T. pp. 24-32.)

At the request of counsel for Defendant, the Court has listened closely to all recordings. The Court has limited ability to understand the speaking of the Spanish language but has listened carefully to the recordings in conjunction with reviewing the transcripts that have been prepared.

Detective Zaragoza had met the informant several years ago and had been using the confidential informant as an informant for about three years. (T. pp. 60-61.) The informant, on occasion in the past, has been paid by the Sheriff's Office for his services. (T. pp. 61-62.) No further evidence was introduced by the Government. Neither Defendant introduced any evidence.

## III. Discussion

### A. The Stop of the Vehicle did not Violate the Fourth Amendment

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend 4.  Pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."  United States v. Calandra, 414 U.S. 338, 347, 94 S. Ct. 613, 619 (1974).

A vehicle stop is permitted when the facts as known by the stopping officers give rises to the level of reasonable articulable suspicion that the vehicle's occupants were engaged in unlawful conduct.  United States v. Arvizu, 534 U.S. 266, 273-275 (2002).  Whether reasonable suspicion exists depends on the totality of circumstances known to the officers stopping the vehicle, including any reasonable inferences, drawn at the time of the stop.  It is the collective weight of the circumstances and inferences that support a reasonable suspicion, because even a series of acts, each capable of an innocent explanation, can collectively support a reasonable suspicion.  Id. at 277-78.  Though a mere hunch is insufficient to justify a stop, reasonable suspicion is not a heavy burden, and a court "must give due weight to common sense judgments reached by officers in the light of their experience and training."  Id. at 273-274.  The likelihood of criminal activity need not rise to the level required for probable cause and it falls considerably short of

satisfying a preponderance of the evidence standard.  Id. at 274.  In addition, a passenger in a vehicle that officers stop, such as Mr. Beltran or Mr. Bernal, may challenge the constitutionality of the stop itself. Brendlin v. California, 551 U.S. 249 (2011)

Based upon the totality of the circumstances in this case, Officers Zaragoza and Lisenbee had a reasonable and articulable suspicion that the occupants of the white Ford truck were engaged in unlawful conduct.  On December 19, 2012, the confidential informant told Detective Zaragoza that the co-defendant Juan Alfaro had offered to sell the confidential informant ounce quantities of methamphetamine.  (T. pp. 8, 64.)  The informant had provided reliable information to Detective Zaragoza in the past.  (T. pp. 61-62.)

On January 22, 2013, the confidential informant placed a telephone call that was monitored and recorded by Detective Zaragoza to Mr. Alfaro. (T. pp. 9-13.) In the call the confidential informant offered to purchase the methamphetamine that had been offered by Mr. Alfaro. (T. pp. 9-13.) Through that recorded call, as well as two subsequent recorded telephone calls made on January 22, 2013, the confidential informant and Mr. Alfaro entered into an agreement to meet the next day at the confidential informant's garage business.  (T. p. 13.)  On January 23, 2013, Mr. Alfaro came to the garage and met with the confidential informant.  This

conversation was recorded and monitored by Detective Zaragoza. (T. pp. 15-16.) Through this recorded and monitored conversation, the negotiations of the confidential informant and Mr. Alfaro were heard by Detective Zaragoza. The confidential informant and Mr. Alfaro agreed to a price of $1,200 for Mr. Alfaro's sale of four ounces of methamphetamine. (T. p. 16.) During the negotiations, Mr. Alfaro made a telephone call to his source of supply, which indicated to Detective Zaragoza and Officer Lisenbee that at least one other person was involved in the distribution of methamphetamine. (T. p. 16.)

Mr. Alfaro then left to get his work truck and stated he would be back to deliver the methamphetamine. (T. p. 16.) Mr. Alfaro was then followed to his home by the officers, where the officers conducted surveillance as he went into his home and then left in his white Ford truck. (T. p. 17.) The officers then followed Mr. Alfaro to a restaurant where the officers saw him dining with Mr. Beltran and Mr. Bernal. (T. p. 18.) The officers then followed the three defendants to a parking lot where Mr. Beltran and Mr. Bernal entered into the white Ford truck that Mr. Alfaro was operating. (T. p. 19.) The officers observed Mr. Beltran carrying an orange lunch box and placing it in the white Ford work truck. (T. p. 19.) The lunch box was of such size as it could contain the methamphetamine. (T. p. 20.) The truck then traveled in the direction of the confidential informant's garage, which

was the place where the methamphetamine was to be delivered to the confidential informant. (T. pp. 32-33.) At that point, Detective Zaragoza and Officer Lisenbee directed the stop of the white Ford work truck by interdiction Officer David McMurray. (T. p. 20.) These circumstances show a reasonable and articulable suspicion that the occupants of the white Ford work truck were engaged in unlawful conduct, that being the delivery of methamphetamine for sale to the confidential informant. In summary, the totality of the circumstances of the contract for the purchase of the methamphetamine by the confidential informant from Mr. Alfaro justified Detective Zaragoza and Officer Lisenbee in having a reasonable suspicion of criminal conduct sufficient to direct the stop of the white Ford truck. The decision to stop the white Ford work truck was well within the bounds of the Fourth Amendment.

Not only was there reasonable articulable suspicion of criminal activity witnessed by Detective Zaragoza and Officer Lisenbee, the level of criminal activity committed by Mr. Alfaro, and known to those officers, additionally created probable cause to not only stop the vehicle operated by Mr. Alfaro, but also to arrest him. As the Fourth Circuit has explained:

> A warrantless arrest is constitutionally permissible if there is probable cause for the arresting officer to believe that a felony is being or has been committed by the arrested individual. See United States v. McCraw, 920 F.2d 224, 227 (4th Cir. 1990). Probable cause to arrest

exists if the facts and circumstances within the arresting officers'
knowledge at the moment the arrest is made would be sufficient for a
prudent man to believe that the defendants had committed an offense.
United States v. Dorlouis, 107 F.3d 248, 255 (4th Cir. 1997). "While
probable cause requires more than bare suspicion, it requires less than
that evidence necessary to convict." United States v. Gray, 137 F.3d
765, 769 (4th Cir. 1998) Even "seemingly innocent activity" can
provide the basis for probable cause when considered in the context of
the surrounding circumstances. Taylor v. Waters, 81 F.3d 429, 434
(4th Cir. 1996).

United States v. Joy, 336 Fed. App'x 337, 339 (4th Cir. 2009) (unpublished).

The facts known to Detective Zaragoza supported not only his and Task

Force Officer Lisenbee's decision to direct the stop of the white Ford truck, but

also was sufficient to create probable cause to arrest Mr. Alfaro. Detective

Zaragoza had heard the telephone calls to and from Mr. Alfaro and the confidential

informant wherein Mr. Alfaro agreed to negotiate the sale of methamphetamine.

Detective Zaragoza further overheard the negotiations concerning the price of the

methamphetamine, the timing of delivery of the methamphetamine, and also the

type of vehicle that would be used to deliver the methamphetamine to the

confidential informant by Mr. Alfaro. Detective Zaragoza and Task Force Officer

Lisenbee followed Mr. Alfaro to his home and saw he had obtained his "work

truck". Detective Zaragoza had witnessed Mr. Alfaro in his white Ford work truck

along with Defendants Beltran and Bernal approach the place of delivery of

methamphetamine. These facts establish probable cause to believe that Mr. Alfaro

was committing, in Detective Zaragoza's presence, the offense of delivery with intent to sell methamphetamine.

At the hearing of the motions, counsel for the Defendant argued that the decision to stop the vehicle was based totally upon the creditability of statements made by the confidential informant. This Court does not find that to be a correct description of the facts. Detective Zaragoza monitored and heard the telephone conversations scheduling the meeting to discuss the sale of the methamphetamine by Mr. Alfaro to the confidential informant. He further overheard, by use of the listening device, the negotiations and the agreement that was reached and the plans of Mr. Alfaro to deliver the methamphetamine. Detective Zaragoza and Officer Lisenbee saw Mr. Alfaro travel to his home and obtain his white Ford truck, and then saw him with the Defendants Beltran and Bernal and witnessed them travel to a point less than forty yards away from the proposed point of delivery of the methamphetamine. The creditability of the confidential informant is not an issue in this case.

## B. Defendants Beltran and Bernal do not have Standing to Suppress the Results of the Search of the White Ford Truck

Although Mr. Beltran and Mr. Bernal have standing as passengers to object to the <u>stop</u> of the white Ford work truck, both Beltran and Mr. Bernal each lack standing to challenge any <u>search</u> of the white Ford work truck. As a threshold

matter, absent some interest in the automobile subject to the search, a mere passenger in the automobile lacks standing to challenge the legality of the search of the vehicle.  See Rakas v. Illinois, 439 U.S. 128 (1978).  Moreover, the burden of proving a reasonable expectation of privacy in the area searched is upon the Defendants.  As the Fourth Circuit has explained:

> As we perceive the relevant principles, it devolves upon one seeking suppression of incriminating evidence to establish as a threshold matter the existence of a reasonable expectation of privacy in the area searched.  United States v. Torch, 609 F.2d 1088, 1091 (4th Cir. 1979) ("The test for whether a person may have evidence obtained in an unlawful search and seizure suppressed is whether the person had 'a reasonable expectation of freedom from government intrusion in the invaded place'.")

United States v. Ramapuram, 632 F.2d 1149, 1154 (4th Cir. 1980).

Here, neither Mr. Beltran nor Mr. Bernal presented any evidence of any reasonable expectation of privacy that either of them had in the white Ford truck. In addition, neither Mr. Beltran nor Mr. Bernal presented any claim of ownership or possessory interest in the vehicle. Rather, all the evidence shows that it was owned and operated by Mr. Alfaro. (T. pp. 17-20.)  Because neither Mr. Beltran nor Mr. Bernal claimed any ownership or possessory interest in the white Ford truck and they failed set forth any reasonable expectation of privacy in the vechicle, neither of them have standing under the Fourth Amendment to challenge the search or the property seized therefrom.  United States v. Carter, 300 F.3d 415,

421 (4th Cir. 2002); <u>United States v. Rusher</u>, 966 F.2d 808, 874-875 (4th Cir. 1992); <u>Ramapuram</u>, 632 F.2d at 1154.

**C. There was Probable Cause to Search both the Vehicle and the Lunch Box.**

Even assuming that Defendants had standing to challenge the search of the white Ford truck, the undersigned finds that the officers had probable cause to believe that methamphetamine was located in the truck and to search the truck without a warrant. In <u>Carroll v. United States</u>, 267 U.S. 132 (1925), the Supreme Court considered the problem of obtaining a search warrant for a vehicle that law enforcement officials had probable cause to believe contained contraband. The Court held that "contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant" where probable cause exists. <u>Carroll</u>, 267 U.S. at 153. Later, the Supreme Court in <u>United States v. Ross</u>, 456 U.S. 798 (1982) explained the <u>Carroll</u> principles in regard to containers found in a stopped vehicle as follows:

> "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few exceptions.' <u>Katz v. United States</u>, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (footnotes omitted)."

> The exception recognized in <u>Carroll</u> is unquestionably one that is "specifically established and well delineated." We hold that the scope

of the warrantless search authorized by that exception is no broader and no narrower than a magistrate could legitimately authorize by warrant. If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.

The Supreme Court further considered the Carroll and Ross doctrines in relation to the search of passengers' belongings found in a vehicle subject to searches in Wyoming v. Houghton, 526 U.S. 295 (1999). As the Supreme Court explained in Houghton:

> Ross summarized its holding as follows: "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id., at 825, 102 S.Ct. 2157 (emphasis added). And our later cases describing Ross have characterized it as applying broadly to all containers within a car, without qualification as to ownership. See California v. Acevedo, 500 U.S. 565, 572, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) ("This Court in Ross took the critical step of saving that closed containers in cars could be searched without a warrant because of their presence within the automobile"); United States v. Johns, 469 U.S. 478, 479-480, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (Ross "held that if police officers have probable cause to search a lawfully stopped vehicle, they may conduct a warrantless search of any containers found inside that may conceal the object of the search").

Houghton, 526 U.S. 301. The Supreme Court also held "that police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search." Id. at 307.

Detective Zaragoza, Officer Lisenbee, and their team of officers had

probable cause to search the white Ford truck.  The evidence shows that Detective Zaragoza had been told by the confidential informant of Mr. Alfaro's desire to sell methamphetamine in December of 2012.  On January 22, 2013, at the direction of Detective Zaragoza, the confidential informant placed a monitored and recorded call to Mr. Alfaro concerning the purchase of methamphetamine.  On January 23, 2013, Mr. Alfaro met with the confidential informant at the informant's place of business and an agreement was reached for the confidential informant to purchase four ounces of methamphetamine for $1,200 per ounce.  The negotiations and agreement were heard and recorded by Detective Zaragoza.  Mr. Alfaro left to get his work truck and the methamphetamine and stated he would be back to deliver the methamphetamine.   Mr. Alfaro was followed to his home by the officers and was seen obtaining his white Ford work truck.   The officers stopped the white Ford truck on its way to the place of business of the confidential informant and within forty yards of the place of delivery of the methamphetamine.  This evidence shows probable cause to issue a search warrant for the interior of the truck and for any containers that could hold four ounces of methamphetamine.

Additionally, the white Ford truck and its contents could have been searched by the officers instant to the arrest of Mr. Alfaro.  See New York v. Beltran, 453 U.S. 454 (1981) (holding that officers may search without a warrant, instant to a

lawful custodial arrest, any portion of the interior of a vehicle from which the arrestee has been removed); Arizona v. Gant, 556 U.S. 332 (2009) (holding that police may search a vehicle instant to arrest of an occupant in two circumstances where the arrestee is not secure and is within reaching distance of the passenger compartment at the time of the search or when it is reasonable to believe that evidence relevant to the crime of arrest might be found in the vehicle). Applying the facts previously set forth, Detective Zaragoza, Officer Lisenbee, and the officers of their team had reasonable cause to believe that methamphetamine would be found in the white Ford work truck.

**D. The Statements of Mr. Beltran and Mr. Bernal and the Results of the Search of their Homes are not Precluded by the Stop and Search of the White Ford Truck.**

Mr. Beltran and Mr. Bernal contend that the statements made by them to law enforcement and the results of consent searches of their homes should be suppressed because they each contend the stop of the white Ford truck violated their Fourth Amendment rights. No other reasons are stated in their Brief (#27) and no case law is cited in the Brief in support of this contention. Evidence seized as a result of an unlawful search and seizure can be suppressed or excluded as "fruit of the poisonous tree." United States v. Wong Son, 371 U.S. 471 (1963). The traffic stop of the white Ford work truck in this case was based upon evidence

which showed not only a reasonable suspicion of criminal activity but was upon probable cause of criminal activity and did not violate the Fourth Amendment rights of either Defendant.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that Defendant Beltran's Motion to Suppress (#27) and Defendant Bernal's Motion to Suppress (#45) be **DENIED**.

Signed: April 9, 2014

Dennis L. Howell
United States Magistrate Judge

## **Time for Objections**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).